Case No. 21-5673, Insite Platform Partners Inc, et al. v. Comtech Mobile Datacom Corporation. Oral argument not to exceed 15 minutes per side. Mr. Stetler Embry, you may proceed for the appellants. Good morning, Your Honors. May it please the Court, my name is Ben Stelter Embry and I represent the plaintiffs in this matter, North American Satellite Corporation. Can you speak up just a little? Sure. North American Satellite Corporation, Insite Platform Partners, and Richard Humphrey. We're here today on the Court's orders granting the defendants summary judgment motion. Just as a little background, this case involves a contract manufacturer. The defendants, they entered into a contract with my clients in 2009 to design, engineer, manufacture, and provide satellite monitoring services for their product, which is just a little brick satellite monitoring device that you attach to a propane tank. And then that feeds data to the satellite, comes down, and my clients' customers are able to look online to see how much gas they have in their tanks, and so on and so forth. So this relationship lasted for about three years, and at the conclusion of their contract, they entered into a release agreement in 2013. And pursuant to that release agreement, Comtech was required to provide all the software and hardware engineering to our clients. What's the most egregious thing that they did not supply to you that you're claiming? The most egregious thing that they did not supply is the software engineering, the source code. Through their subcontractors, Comtech provided the hardware engineering that was for the printed circuit boards and these plastic enclosures. But it's our contention that we never received the software engineering. What should we do with the fact that the district court in the motion for reconsideration order suggested that you had forfeited this claim, this distinction between the software and the hardware? I believe you raised it most squarely in the motion for recon on why the district court got it wrong, and the district court's response was, well, you should have raised that in the initial summary judgment motion. Well, I think there was, at the time, you know, I don't think we appreciated the court's, well, let me back up. So there was the manufacturing. My client, we admitted to the fact that we got the files that would allow our clients to manufacture the product. They were able to hire another contract manufacturer to put together the printed circuit boards. They continued on with the company that built the enclosures and put the units together. It wasn't until that there was a problem on those units, which was this battery drain issue, that our clients went back to the contract manufacturer to try to figure out this problem. They reviewed all the engineering that they had received through ComTech and found that they didn't have the source code which they needed in order to fix this unit, to be able to troubleshoot and understand what was going on and make any engineering design changes that they needed. So it wasn't until a year later that they realized that the source code, and I think there were some other code issues as well, that they did not have. And they had this reviewed by two engineering companies who reviewed all of the engineering and both determined that they didn't have the source code and that they desperately needed the source code in order to fix it. Can I ask a question? So at that point, did you just ask? They did. Can we have the source code, please? They did, and ComTech, you know, refused essentially because But did you specify what it was that you didn't have? I thought maybe you said we didn't get some of the engineering materials or we didn't get all of the engineering materials. Was that sufficient to put them on? So prior to the June 2013 settlement agreement and afterward, there were conversations and there was an email sent by my client to ComTech that detailed all of the engineering files that they needed. And that included all the source code and whatnot. So they had a very clear understanding of what they were required to hand over. This email was forwarded by the COO of the company to the people at ComTech who were responsible for gathering all of the engineering files for our client. Do you think there's an issue of fact that needs to be decided by the district court? And if so, what is it? So, Your Honor, there were five people who testified on the engineering files issue. Two witnesses from ComTech and three witnesses from our side. One of ComTech's witnesses testified during their deposition that she was responsible for putting together this manufacturing package with some other people. The software engineering files were collected by a ComTech employee who allegedly gave these to her and then she passed them along to another employee. She testified that there were two CDs that she gave to this employee that were sent in two separate shipments to our client. She later changed her testimony by affidavit after her deposition. And I asked her numerous times during her deposition to reconfirm that these were shipped in two separate shipments. And she stuck with it. I think I asked her three separate times. She changed her testimony after the fact. And then they had another employee who testified that he put this testing unit with a laptop computer and a CD, again a different number of CDs than she had testified about, into a box that was shipped to my client. My client does not deny that he received this box. He denies that there was any CD in it that had the requisite engineering files. What was in that second shipment? We never received a second shipment and there's no evidence in the record that there was a second shipment sent. There was some shipment where they just had a few things in it that wasn't nearly what was supposed to be in there. What was that? That was the shipment that had this testing unit where my client could plug one of their SkyTrackers into this system and run tests on it to make sure that it was operating properly. And ComTech intends that there was a CD with this manufacturing package in that box. We testified that there was no CD in the box and that we had two separate companies review the engineering and the software engineering wasn't in there. This is where the district court improperly weighed the credibility of the witnesses. The court essentially wholesale ignored our side's testimony on this issue and instead credited their witnesses' testimony, who are two employees of a company who, quite frankly, are trying to save their skin versus my client who's trying to run a company and is facing financial ruin if he can't continue to manufacture and produce this product for his business. But he can manufacture it. He can manufacture it, but he can't fix it. And they knew that, for example, the modem on my client's units, they were being phased out by the satellite, by this company GlobalStar. ComTech knew that. My client knew that. They knew they were going to have to redesign the circuit boards in order to accommodate this new modem when they sent the engineering files to my client. And they couldn't do it without the source code. There's plenty of evidence on the record talking about the fact they had to have these files in order to accommodate these changes. Additionally, just to make any fixes, like on this battery drain issue, they needed this source code. There's a contract interpretation question on the table here, too. So all of that might be what was in the box is the question of fact, but that might be irrelevant if releasing the engineering materials could be satisfied by making the subcontractors available and releasing them from their nondisclosure agreements. That's what Applees argue. What do you want to say about that? Those subcontractors did not have the software engineering. They did the printed circuit boards. They had hardware engineering files for the printed circuit boards and the enclosures. ComTech exclusively designed... Is that disputed or is that fact undisputed? Their own witness, Stratus Mineris, testified that they had the software engineering files. And we are unaware of any other companies that had the software engineering files or did any sort of programming work on the SkyTracker 3 units. I'm sorry, just to clarify this in my mind. The subcontractors that we're talking about didn't have the software. They didn't have the source code, and that's undisputed or has been admitted. That's not a question of fact. That clarifies things for me. Thank you. So switching just briefly about the Lanham Act claim, what's your best case for the suggestion that the circumstantial evidence of just receiving parts is enough to show that there were illegal sales? That strikes me as quite circumstantial. I'm not certain a reasonable jury could make that jump from these parts to actually illicit sales happening when there's no real evidence of those sales. Your Honor, my response to that is that the case law shows that circumstantial evidence can be persuasive evidence. I don't feel like it was the district court's proper ruling to be able to determine whether or not that evidence rose to the level of... We decide all the time circumstantial evidence isn't enough in the Title VII context. So that's anti-discrimination. Most of the time you don't have direct evidence and you have to rely on circumstantial evidence. Courts all the time say, well, this isn't enough circumstantial evidence to create a genuine issue of material fact. So I think that it's perfectly okay for district courts to think that some circumstantial evidence just isn't enough. Well, in this case, ComTech was the only company that was responsible for collecting the data that the SkyTracker units were obtaining and putting that onto a website for our customers. So they're the only ones, theoretically, that we're aware of that could have possibly cloned these units to make them actually functioning propane gas monitors. So we feel that the evidence would suggest that a jury looking at that could come to the conclusion that ComTech was involved in this pirating scheme. But there is no direct evidence of it. Have you measured what it would cost to put you back in condition had you gotten the software? Or if you got the software now, would it have any value? At this point, no. My client has built two new... This was a SkyTracker 3. They're at the SkyTracker 5. They had to move on and redesign and re-engineer a whole new unit, the SkyTracker 4. And they've since built... You're asking for damages because of the breach? Is that what you're asking for? I'm asking for damages because of the breach, the lost sales. There were units that were manufactured that had this battery drain issue. I think there were 746. They had to mothball those. And so they lost sales and they lost the monitoring fees. They charged a monthly monitoring fee. That's where a bulk of the revenue comes from is the monitoring fees that are for these units. Other questions? Have you tried to go through mediation in this case? No. We have had numerous settlement discussions. I think there was a mediation very, very early on on another case years and years ago. Oh, I'm sorry, Your Honor. We did have mediation with the Sixth Circuit. With the Sixth Circuit. Yeah. And apparently that was unsuccessful. Yes. All right. Thank you. We'll hear from the appellees. Good morning, Your Honors. May it please the Court, Eric Liebeck from Nashville, Tennessee, here on behalf of the Defendant Appellee Comtech Mobile Data Com. This Court should affirm the judgment. This is a straightforward case with a well-developed record. The parties fully cooperated in discovery. There were no motions to compel. Parties amended the scheduling order twice by agreement to allow sufficient time for discovery. They took a total of 12 fact witness depositions, sent third-party subpoenas to multiple parties, and after all of that discovery, certain key facts were undisputed. And the plaintiffs, I'll call them NASCorp, although there's a group of them, faced with this record, had no choice but to make certain unconditional factual admissions in connection with Comtech's motion for summary judgment. And those admissions, those undisputed facts, were fatal to NASCorp's claims. The district court properly accepted those admissions and dismissed those claims in summary judgment. But would you agree at the outset that there is a dispute of fact over what was in the box that was sent? I don't believe there's a genuine issue of material fact. I mean, the person who opened the box testified that the engineering materials were not in the box. So, I mean, isn't that enough to create a genuine issue of material fact? In the context of the case as a whole, and the timing of that, set against the evidence about the contents of that box. So, you have dozens of contemporaneous emails from employees of Comtech regarding what was in the box. There are 10 separate employees involved in this process, including the president. You have testimony from three of those employees about their roles in gathering documents, putting them on a disk, getting them in. In fact, you have an email that's in the record that describes the contents of that package and includes a tracking number, which is signed for by NASCorp. And you have a contemporaneous email from the same individual who testified about opening the box, saying, we're going through the engineer. You have a year. Wait, wait. The person who opened the box who said what? Because all of that is like, we put the stuff in the box. But when, as Judge Murphy says, when the person opened the box, he's like, oh, there's no CD in here. But at the time, he, well. At the time, he didn't inventory and say CD in box, did he? No, Your Honor, he didn't. Okay. But fundamentally, whether there's a dispute about the contents of the box is irrelevant for two reasons, as I believe you noted, Judge Larson. And the first relates to the contract interpretation issue. And there are two key phrases. The actual language of the contract reads, release all SkyTracker 3 engineering drawings and related information to NASCorp. And so there's two facets of that. First, there's the word release. And the record is clear. There were releases. Those are docket entries 65-13 through-15. Those releases are in the record. They were sent. It's clear those happened. There's no dispute about it. Yeah, but what did they release? They released the subs from their nondisclosure agreements. They released the files that the subs had and allowed them to use those files with NASCorp. But he says the subs didn't have the right files. They didn't have the source code. He says that's undisputed. That's not correct, Your Honor. Okay, please enlighten us. There is absolutely no record evidence for the proposition that the subcontractors did not have software engineering. The record evidence is a statement of undisputed fact that they had all files necessary to manufacture the product. Yeah, but again, manufacture the product is different than maintain the product, right? So they concede they can make the SkyTracker 3, more SkyTracker 3s. But the appellants also say, but we couldn't service them. They were breaking down. Our batteries were failing. We needed the source code to do that, and we didn't have that. So the source code seems to be the missing thing that the appellants say should have been in the box. That seems to be the key to the whole thing. And appellants say that the subcontractors didn't have the source code either and that they asked you for the source code. So how did you release the source code to appellants? On the record before the trial court at summary judgment, there was no evidence that the subcontractors did not have the software. This argument was not raised at summary judgment. It was not raised for the first time until the motion for reconsideration. And it's worth noting that in the context of that motion for reconsideration, they did not cite to any of the statement of material facts put forth by the parties for that claim. There were a total of 167 material facts asserted by both parties. Okay, but wait. Is it their burden to show your claim, their claim on the contract, is you had, release means you had to deliver me physically a box with the stuff in it, including the source code. You say we could comply with the contract in a different way by simply making sure that our subcontractors had all the relevant materials and were available to them. If that's your interpretation of the contract, is it their burden to prove the negative? They have to show that you didn't provide the subcontractors with the, maybe that's right? Yes, Your Honor, I believe that is right. A summary judgment motion is a put up or shut up motion. Sure, sure. So they had to show that the subs didn't have it. It's not that you had to show that they did have it. But you have, you admit that you've never shown that they did have it. You say it's not your burden, but. Specifically related to the source code? Source code. There is no evidence one way or the other in the record as to whether the subcontractors have or do not have the source code. The closest they come, and this is the evidence that counsel raised, is the testimony of a ComTech employee saying that ComTech did have source code. But the fact that ComTech had the source code is not dispositive one way or the other as to whether that source code was shared with the subcontractors. Okay. So the second contractual issue I'd like to also raise, it relates to the second half of that clause. The contract itself doesn't say source code. It says engineering drawings and related information. Now engineering drawings, it's a term of art, I believe we cited cases for that before the district court, that refers to what you need to build the product, not to maintain it. So there are two contractual issues there. What does the word release mean? And does source code fall within engineering drawings? Do you think that there's a superfluity concern? We don't, generally speaking, try to interpret contracts to make provisions unnecessary or meaningless. And the very next provision directs ComTech to provide notice to the subcontractors to work with NASCOR. So I'm looking at it right now. So under your view of the first provision, it seems like what's the point of the second one? That's a good question, Your Honor. And I think the answer to that comes when you look at, I believe it exhibits 13 and 14 to our motion for summary judgment. These are the communications with Advanced Assembly, which is one of those subcontractors. And at the time of contracting, there is an initial email saying, hey, you are free to work with NASCOR. So that's the second provision of the contract. They reach back out and say, do you need anything else from us? And the contract says, well, yeah, we need you to release your claims to these files so that we can actually use them. So it's a two-step process. You have to tell them to work with them and you have to release the files. And so you can see that that's the way it worked with Advanced Assembly. They asked for two separate communications. And so the way it worked out, those two provisions are certainly not superfluous. So the second one still doesn't, the first one still doesn't encompass, wouldn't, under your view, that they had a duty to release if that includes merely allowing the subcontractors to use? So you're suggesting that the second one is just, it won't be a breach and the first one is a requirement, I guess? So the second one is, if the subcontractors work with NASCOR, it's not any type of breach of any separate agreement, and the first one is a duty for the subcontractors to actually work with NASCOR? I guess I'm confused by the two-step process. So there are two issues. The first is, moving forward, these subcontractors, can they work to develop this product that they've been building for ComTech with NASCOR? The second issue is, as it relates to claims to the files that are used to build that product, can they work with them and can they use the files they have? Those are two separate issues. They could continue to work with them without using the files already in their possession. So they kind of come up with it on their own or something? Well, or those files could come from NASCOR, new files, the files could be returned to ComTech to give to NASCOR. In the record, there's an issue there between we can work with them moving forward and can we use the files that you've given us, that under our prior agreements with you, we can't just share freely. And so this would be, I think, Exhibits 13 and 14 or 14 and 15. Now, your client was supposed to provide this, but your client indicated that just go over there and get a hold of this information from our subcontractors. That wasn't in line with the contract, though, was it? My client's position is that they did provide the documents. They did provide it? The first time. They didn't? Okay. They didn't just say go see the subcontractors? No, Your Honor. Their position was they provided it, and I think we're probably trending into maybe 408 territory as it relates to possible settlements, but since it's been brought up by Council Act. Well, how did they provide it? Was it just in that box that came and they said they didn't really get everything, or was it some other way? The position of my client is that they provided it in the box, but as it relates to this case, ultimately whether all the documents were in the box is irrelevant, because on the record before the district court at summary judgment, it was undisputed that these subcontractors had everything that was needed to manufacture the product and that they were free to use those files and to work with plaintiff appellants to develop and build that product. And so any technical breach of what was in the package, what was not, assuming you're required to send something as opposed to just releasing it, any technical breach of that is moot. That's what the district court referred to as the death knell of the breach of contract claim. When they got the box, did they send an email or something to your client and say, here's what we're missing, send that to us? No, Your Honor, they did not. Not until over, it was either right out or over a year later, in response to a letter from my client reminding them that they owed my client money. And what did your client do in response to the email? Say, here's the stuff you need, or we don't have it, or go see the subcontractor, or pound salt because you still owe us money? I believe the response, and again, I think we're kind of going into 408 settlement territory here, but since it's on the table, I believe the response was, if you will pay us what you owe us, we will send it again. We've sent it before, we'll send it again, or you can get it from somewhere else. I don't recall, I don't know if those emails are in the record. Okay, yeah, I don't want to know about stuff that's not in the record. I'd like to also quickly touch on the Lanham Act claim, and I think whether there's circumstantial evidence or not is beside the point, because it is black letter law that you must show unauthorized use of a trademark in commerce to have a claim under this section of the Lanham Act, and I don't believe plaintiff appellants are disputing that law. And again, at summary judgment, NASCorp admitted that it had no evidence of unauthorized use of its mark in commerce, and it reiterated that admission at page 47 of its appellate brief. That's a threshold inquiry under the Lanham Act, and so on the record before the district court, in light of this admission, summary judgment was appropriate on that claim. And if I may, before I conclude, I'd like to emphasize there is an alternative grounds for affirming the district court on all issues which relates to the nature of the damages sought by the plaintiffs. And again, that's a rather straightforward issue. Under Tennessee law, you can only seek damages for loss of net profits, and that's simply not what the plaintiffs sought in this case. They sought loss of gross property. And there's a whole host of case law standing for the proposition that if all you've put on is proof of gross profits, you haven't put on proof of overhead, expenses, marketing, that kind of thing associated with the sales, there's no way to render a damages verdict that isn't inherently speculative. So even if the contract required a shipment, even if there were a genuine dispute, even if that were not mooted by the release given to the subcontractors, the district court could and should still be affirmed on the grounds that the damages sought are not recoverable under Tennessee law. Other questions? You still have some time left if you have anything else you'd like to say, but I think we have exhausted our questions. If the court has no further questions, thank you. All right, thank you. We'll hear rebuttal. Thank you. I just want to address just two quick things. First, on the lost profits issue, my client's profits are, excuse me, their damages are not just exclusively lost sales and lost net profits. How soon after you got that box did you notify the opposite party that you didn't send everything you're supposed to? Our clients didn't understand, they didn't know that they didn't have the source code until June of 2014. So it's almost a year. And while defense counsel brought up the fact that this happened after our clients got a letter from Comtech, that's merely coincidental. Our clients happened to discover this battery drain issue in the spring of 2014 after they had hired another contract manufacturer. My client happened to be at the contract manufacturer's plant when they were trying to resolve this issue when he contacted Comtech and said, hey, we don't have the source code or these other files. Can you provide them? And then things, you get into settlement territory there. And also they had obtained this distinction between the manufacturing and the programming or maintenance of the units. Advanced Assembly just built printed circuit boards. Sinotech just built plastic enclosures. They had nothing to do with the design or programming of the microprocessors on the SkyTracker 3 units. That was not within their purview. And my clients asked those subcontractors for their engineering files, which they provided. They didn't provide any source code to my clients. Can you respond to Judge Larson's questions to your friend on the other side about what evidence is in the record about whether the subcontractors did or did not have the source code? Do you have specific pieces of evidence? Can you just list through the pieces of evidence that suggest, I mean a friend on the other side suggests there's no evidence in the record on this whatsoever. Yeah, I mean the only evidence, no. There's no evidence that Advanced Assembly didn't have the source code or that they did have the source code. And that's also true for the other subcontractor, Sinotech. The only evidence on the record as to who had the possession of the source code is through the software engineer who worked on it who was a ComTech employee who was responsible for maintaining and updating the source code throughout the three-year contract that they had with ComTech. There's no evidence that anybody else had any source code other than ComTech. So what should we do with the lack of evidence in the record? Who bears the burden of presenting evidence to create a genuine issue of material fact? Wouldn't that be you? Or why isn't it you? To affirmatively show that they didn't have the source code. The subcontractors. So once they file a motion for summary judgment, they generally speaking don't have to present evidence because you have the burden of proof. And then didn't you have the burden at least of presenting some proof that they didn't have? I think at this stage ComTech filing their motion for summary judgment on the claims needs to show that there was another avenue through which NASCOR could obtain this software engineering and they haven't met that burden. The only thing that my client knew at the time during this three-year contract that they had was that ComTech was providing and maintaining all of the source code that they needed to program the microprocessors in their units. There was no other subcontractor that we were aware of in that mix other than those two which were not providing any software engineering services. And my client paid for, there is evidence in the record that my client paid for the software engineering that they hired ComTech to provide to them. That that was paid for in full. And there was no other evidence there. So I guess I would say the reasonable inference in viewing the facts in light favorable to the plaintiffs is that on that particular issue, I think the balance falls on NASCOR's favor on that particular software engineering issue. And how does source code fall within engineering drawings and related info? Like if it were just engineering drawings, you wouldn't fall within. So it's related information. Drawings seem to me... This to me is a... ComTech has brought this issue up that somehow it's this term of art and that they weren't responsible for providing the software code or something under this language. However, the emails, the communications between the companies clearly showed that ComTech was aware of the fact that they were to provide the software engineering. Their own employees testified that they collected all the software engineering and put it on these CDs. And this email was circulated among ComTech staff. There's plenty of evidence on that record that they were supposed to do that. So the understanding of the parties based on their actions after they entered into the release agreement did show that they knew and were aware of what they were to provide. Questions? All right. Thank you very much. Thank you both for your fine arguments this morning. You've been helpful to the court.